Hand-Delivered

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

FILED
CHARLOTTE, NC
SEP 30 2026
US DISTRICT COURT
WESTERN DISTRICT OF NC

Jahlil I. Kure,

Plaintiff,

v.

AMERICAN EXPRESS NATIONAL BANK,

Defendant.

Case No. 3:26-CV-822-SCR

COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jahlil I. Kure ("Plaintiff"), proceeding pro se, brings this action against Defendant American Express National Bank ("American Express," "AmEx," or "Defendant") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., and alleges as follows:

## I. NATURE OF THE ACTION

1. This action arises from American Express's repeated investigation, verification, and continued furnishing of disputed credit information concerning Plaintiff's American

Express account after receiving notices of dispute from nationwide consumer reporting agencies.

2. Plaintiff does not allege merely that he disagreed with a debt or that a charged-off account could not carry an unpaid balance.

3. The dispute concerns objectively verifiable historical information concerning Plaintiff's account, including the Date of First Delinquency ("DOFD"), the month-by-month progression of the delinquency, the dates associated with closing and charge-off, and the historical payment information American Express furnished to consumer reporting agencies.

4. Over multiple years, materially different historical delinquency sequences appeared for the same already-completed months of 2023.

5. American Express itself repeatedly participated in CRA dispute investigations concerning these issues and repeatedly returned responses stating, among other things, that information was accurate, verified, updated, or required no change.

6. American Express possessed its own billing statements, account ledger, payment-plan information, delinquency records, charge-off information, furnishing history, and other account-level records capable of determining the correct historical chronology.

7. American Express's own July and August 2023 billing records state that the account was already past due during the summer of 2023.

8. Nevertheless, different historical versions were repeatedly verified and reported through the nationwide consumer reporting agencies.

9. After numerous CRA-triggered disputes, American Express expressly acknowledged that it received additional CRA disputes through the Automated Credit Dispute Verification

("ACDV") system and responded on October 31, 2025 and November 3, 2025 by validating its reporting as accurate.

10. Less than three months later, American Express stated in writing that it was "unable to validate the debt on the account" and was unable to provide documents validating the account, while simultaneously maintaining that the credit reporting was accurate.

11. Plaintiff does not contend that this statement, standing alone, proves that the debt never existed.

12. Rather, it reinforces the central issue presented by this action: what investigation did American Express actually perform, and what account-level evidence did it review before repeatedly verifying disputed historical information as accurate?

13. Plaintiff alleges that American Express failed to conduct the reasonable investigations required by 15 U.S.C. § 1681s-2(b).

## II. PARTIES

14. Plaintiff Jahlil I. Kure is a natural person and a "consumer" within the meaning of 15 U.S.C. § 1681a(c).

15. Plaintiff resides in Mecklenburg County, North Carolina.

16. Defendant American Express National Bank is a national bank that furnishes consumer-credit information to nationwide consumer reporting agencies.

17. Plaintiff's Cardmember Agreement identifies American Express National Bank as the issuer of Plaintiff's Platinum Card ending in 2003.

18. Consumer reporting agency records concerning the disputed American Express tradeline identify account number XXXXXXXXXXXX7413, commonly displayed as ending in 7413.

19. American Express's January 19, 2026 correspondence identifies the account under its internal/card identifier ending 2003 while simultaneously discussing the CRA disputes American Express received concerning Plaintiff's account.

20. The precise internal relationship between the full CRA identifier ending 7413 and American Express's card identifier ending 2003 is information uniquely or primarily within Defendant's possession and will be confirmed through discovery.

## III. JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

22. This Court also has jurisdiction pursuant to 15 U.S.C. § 1681p.

23. Venue is proper in the Western District of North Carolina under 28 U.S.C. § 1391 because Plaintiff resides in this District and a substantial portion of the injuries and adverse credit consequences giving rise to this action occurred in this District.

## IV. CONTRACTUAL CLAIM NOTICE

24. Before commencing this action, Plaintiff provided Defendant written notice of the FCRA claims asserted herein and the relief requested.

25. On March 24, 2026, Plaintiff sent that written notice to Defendant at its designated notice address and afforded Defendant an opportunity to resolve the matter before formal proceedings.

26. Defendant did not substantively respond to or resolve Plaintiff's claims following that notice.

27. To the extent any pre-suit notice requirement applies to the claims asserted herein, Plaintiff has satisfied that requirement.

## V. THE UNDERLYING AMERICAN EXPRESS ACCOUNT

28. Plaintiff's account was opened on or about September 14, 2022.

29. American Express later stated that the account's Date of First Delinquency was June 12, 2023.

30. American Express stated that it did not receive at least the minimum amount due for Plaintiff's June 2023 through December 2023 billing statements.

31. American Express further stated that the account reached charge-off status on December 15, 2023.

32. American Express identified December 23, 2023 as the cancellation date.

33. American Express stated that as of January 14, 2024 it was reporting the account as an unpaid charge-off.

34. CRA and ACDV records, however, repeatedly contain a DOFD of June 13, 2023.

35. At another point, Equifax reported a June 1, 2023 first-delinquency date.

36. Plaintiff does not rely on the one-day June 12 versus June 13 discrepancy as a standalone basis for liability.

37. The significance of the changing DOFD information is that it forms part of a larger pattern in which the historical delinquency chronology itself was not reported consistently.

## VI. AMERICAN EXPRESS'S OWN ACCOUNT RECORDS

38. American Express's July 14, 2023 statement expressly stated that Plaintiff's account was past due.
39. The statement included a past-due amount of approximately $425.42 as part of the minimum payment due.
40. American Express's August 14, 2023 billing statement again expressly stated that Plaintiff's account was past due.
41. The August statement further stated that Plaintiff was participating in a payment plan.
42. American Express instructed Plaintiff to make the agreed payment so that the account would not go "further past due" and explained what would be required to bring the account current.
43. Plaintiff does not contend that the phrase "past due" on a monthly billing statement automatically establishes a particular CRA 30-day delinquency rating for that same month.
44. These statements are significant because they demonstrate that American Express possessed detailed underlying records regarding the actual status and progression of the account.
45. Those records could be reviewed during an FCRA investigation to determine whether the historical information furnished to a CRA was accurate.

VII. EXPERIAN REPORTED MATERIALLY DIFFERENT HISTORICAL VERSIONS

46. On March 30, 2024, Experian reported Plaintiff's American Express history as current through September 2023, followed by:

September 2023 — Current/OK

October 2023 — 30 days late

November 2023 — 90 days late

December 2023 — 120 days late.

47. That sequence did not contain a 60-day delinquency month.

48. Significantly, the March 30, 2024 Experian report did not merely reflect unchallenged raw account data. The same report stated that an FCRA dispute investigation concerning the account had already been completed and that Plaintiff disagreed with the result. Thus, the historical sequence showing September as current, October as 30 days late, November as 90 days late, and December as 120 days late had remained on Plaintiff's file after a dispute investigation.

49. Plaintiff continued disputing the American Express reporting through the consumer reporting agencies during the following months.

50. On or about March 20, 2024, Plaintiff submitted a dispute through TransUnion that included the American Express account. On April 26, 2024, TransUnion reported the American Express tradeline as "VERIFIED AS REPORTED."

51. On August 4, 2024, TransUnion received another dispute concerning the American Express account. That dispute challenged account information including account type or terms, credit/high-credit information, and requested verification of account dates.

52. American Express responded to that dispute on or about August 29, 2024 by stating that the information was accurate as of its last submission and updating the account for latest activity. TransUnion thereafter characterized the result as "VERIFIED AS ACCURATE AND UPDATED."

53. Thus, between March and August 2024, the American Express tradeline was not simply sitting unexamined on Plaintiff's credit files. Plaintiff repeatedly challenged the reporting through the CRA dispute process, and the account repeatedly emerged from those investigations as verified, verified as reported, or verified as accurate and updated.

54. Yet by September 27, 2024, Experian displayed a materially different historical sequence:September 2023 — 30 days late

October 2023 — 60 days late

November 2023 — 90 days late

December 2023 — 120 days late.

55. The same completed historical months had therefore been materially changed from the version that had previously remained on Plaintiff's file after dispute investigation. The September version moved the first reported 30-day delinquency from October to September and inserted a 60-day delinquency in October that had not appeared in the March version.

56. These differences do not concern a balance or account status naturally changing as time passed. They concern the historical characterization of months that had already ended in 2023.

57. The March and September versions cannot both accurately describe the same historical payment sequence.

58. The sequence of events also raises a separate investigation question: if the earlier history had already been investigated and verified, what account-level information later caused the historical months to be rewritten, and why was that information not identified during the earlier investigations?

59. American Express possessed the underlying billing statements, payment records, delinquency-aging information, payment-plan records, and furnishing history necessary to determine which sequence was accurate.

60. Plaintiff therefore alleges that the repeated verification of one historical configuration, followed by the later adoption of a materially different configuration for the same completed months, is evidence relevant to whether American Express conducted investigations reasonably capable of determining the true account history.

## VIII. TRANSUNION CRA-TRIGGERED DISPUTES

61. Plaintiff repeatedly disputed the American Express tradeline through TransUnion.

62. On September 17, 2024, TransUnion received a dispute instructing American Express to verify all account information.

63. TransUnion processed the dispute on September 20, 2024.

64. American Express responded that the consumer dispute was not specific, that consumer information was verified, and that account information was updated.

65. TransUnion processed the American Express response on September 24, 2024.

66. This dispute placed American Express on notice that Plaintiff challenged the accuracy of the account information.

## IX. THE DECEMBER 2024 DISPUTE WAS HIGHLY SPECIFIC

67. On December 25, 2024, TransUnion received another dispute concerning Plaintiff's American Express account.

68. TransUnion expressly transmitted dispute code F5:

"Disputes Date of First Delinquency. Verify Date of First Delinquency."

69. TransUnion also transmitted F6 challenging the date opened, date of last payment, and/or date closed.

70. Plaintiff's accompanying consumer comment requested verification of the charge-off date.

71. Thus, unlike a vague generalized dispute, this dispute identified specific dates that could be objectively compared against American Express's own records.

72. The TransUnion account data associated with the investigation reflected:

Date Opened — September 14, 2022

Date of First Delinquency — June 13, 2023

Date Closed — December 15, 2023

Balance — $5,023

Past Due — $2,868

High Credit — $15,698.

73. American Express responded:

"Information accurate as of last submission. No change."

74. The response was processed by TransUnion on January 3, 2025.

75. TransUnion subsequently characterized the dispute result as "VERIFIED AS ACCURATE AND UPDATED."

76. Plaintiff alleges that American Express was therefore expressly required to investigate objectively verifiable account dates and historical information, rather than simply confirm existing database fields.

## X. CROSS-BUREAU HISTORICAL INSTABILITY

77. The historical information concerning the American Express account also changed across TransUnion and Equifax.

78. One TransUnion historical version reflected an August 2023 30-day delinquency, followed by September 60, October 90, November 120, and December charge-off.

79. A later version reflected September 30, October 60, November 90, and December 120.

80. Equifax likewise displayed different versions of the same historical sequence at different points.

81. By May 11, 2026, Equifax reported the American Express account ending 7413 with a June 13, 2023 DOFD, a $5,023 balance, a $3,777 past-due amount, a $15,698 high credit amount, and a charged-off status.

82. Plaintiff acknowledges that consumer reporting agencies may map or display furnished information differently.

83. Accordingly, Plaintiff does not assume that every cross-bureau presentation difference was caused solely by American Express.

84. Discovery is necessary to obtain the actual monthly data American Express furnished to each CRA and determine whether the differences resulted from inconsistent furnishing, CRA presentation, or both.

85. What is already established is that American Express repeatedly received CRA disputes concerning an account whose historical reporting was materially unstable.

## XI. THE OCTOBER 31 AND NOVEMBER 3, 2025 ACDV INVESTIGATIONS

86. American Express has admitted in its own written correspondence that it received additional online disputes from consumer reporting agencies through the ACDV process.

87. American Express states that it responded to those disputes on October 31, 2025 and November 3, 2025.

88. American Express further states that, in responding to those disputes, it validated the information it was reporting as accurate.

89. These events are particularly significant because American Express had already participated in multiple previous CRA dispute investigations concerning the same tradeline.

90. By late 2025, American Express had substantial notice that Plaintiff disputed the accuracy and completeness of the historical account reporting.

91. The complete October 31 and November 3, 2025 ACDV records have not yet been produced to Plaintiff.

92. Plaintiff therefore does not presently allege the precise dispute codes or every specific field contained in those ACDVs.

93. Plaintiff will seek the original ACDV transmissions, American Express's complete response data, investigator notes, system logs, records reviewed, and associated policies in discovery.

## XII. AMERICAN EXPRESS'S JANUARY 19, 2026 WRITTEN RESPONSE

94. On January 19, 2026, American Express responded to Plaintiff concerning CFPB Reference No. 251122-26141325.

95. American Express stated:

"We are unable to validate the debt on the account."

96. American Express further stated:

"We are unable to provide documents validating your Accounts."

97. At the same time, American Express maintained:

"We're reporting your account accurately."

98. American Express also refused to make the requested credit-report changes on the stated ground that its reporting was accurate.

99. In the same letter, American Express stated that it had received the October 31 and November 3, 2025 CRA disputes and had validated the reporting as accurate.

100. Plaintiff does not allege that an inability to provide "debt validation" automatically extinguishes or invalidates an account.

101. The relevance of the January 19 response is instead to the nature and reasonableness of American Express's investigation.

102. American Express represented to the CRAs that disputed reporting had been validated as accurate.

103. Yet American Express subsequently stated that it was unable to validate the account debt or provide validating documents.

104. These representations create a factual issue as to what information American Express actually examined when conducting its CRA-triggered investigations.

## XIII. AMERICAN EXPRESS ITSELF IDENTIFIED A SPECIFIC ACCOUNT CHRONOLOGY

105. Despite stating that it could not validate the debt, American Express's January 19 correspondence separately identified specific historical information.

106. American Express stated:

Date Opened — September 14, 2022;

Date of First Delinquency — June 12, 2023;

Minimum payments not received — June through December 2023;

Charge-off — December 15, 2023;

Cancellation — December 23, 2023;

Unpaid charge-off reporting — beginning January 14, 2024.

107. Those factual assertions demonstrate that American Express had access to account information capable of establishing an account chronology.

108. Plaintiff alleges that a reasonable FCRA investigation required American Express to reconcile that chronology against the historical payment information it repeatedly furnished and verified.

## XIV. CONTINUED PUBLICATION

109. American Express continued furnishing derogatory information concerning Plaintiff's account after multiple CRA dispute investigations.

110. Consumer reports in 2025 and 2026 continued to reflect the American Express account as a charged-off derogatory tradeline.

111. Experian continued reporting the September 2023 through December 2023 30/60/90/120 sequence into 2026.

112. In September 2026, Experian still displayed the American Express account as charged off with a $5,023 balance and the September-through-December 30/60/90/120 sequence.

113. Plaintiff alleges that the continued reporting caused repeated dissemination of disputed derogatory information to actual credit decisionmakers.

## XV. ACTUAL ADVERSE CREDIT EVENTS

114. Plaintiff suffered multiple adverse credit events during the period in which the disputed American Express tradeline remained on his reports.

115. Plaintiff does not contend that American Express was the only derogatory tradeline on every report or the sole cause of every adverse action.

116. The adverse-action evidence is relevant because it establishes that actual third parties obtained and used consumer reports containing the disputed American Express

information and identified serious delinquency and related derogatory factors as materially adverse.

PNC Bank

117. On June 16, 2025, PNC Bank denied Plaintiff an installment-loan application.

118. The adverse-action materials identified Experian and reflected an Experian score of 541.

119. Factors included serious delinquency, excessive balance-to-limit ratio on revolving accounts, too few accounts currently paid as agreed, and number of accounts with delinquency.

TD Bank

120. On June 18, 2025, TD Bank denied Plaintiff's approximately $237,500 mortgage prequalification application.

121. TD Bank obtained consumer-report information from Experian, TransUnion, and Equifax.

122. The same application reflected materially different scores across the three CRAs, including Experian 650, TransUnion 512, and Equifax 608.

123. Adverse factors included serious delinquency, number of accounts with delinquency, recent delinquency, amount past due, and related derogatory credit factors.

Tesla Finance

124. On September 16, 2025, Tesla Finance issued an adverse credit decision concerning Plaintiff's auto-financing application.

125. Tesla identified TransUnion as a source and reflected a TransUnion score of approximately 550.

126. The score factors included serious delinquency, recent delinquency, number of delinquent accounts, revolving balances, and inquiries.

127. TransUnion's own records identify Tesla Finance as having accessed Plaintiff's TransUnion file on September 16, 2025.

PenFed Credit Union

128. On or about June 25, 2025, PenFed Credit Union denied Plaintiff's auto-loan application.

129. PenFed used Experian information and disclosed an Experian credit score of 546.

130. The disclosed factors included serious delinquency and derogatory public-record/collection information, revolving utilization, number of accounts with balances, and loan-balance factors.

131. The PenFed denial occurred on the same date on which American Express later acknowledged responding to one of the late-2025 CRA ACDVs.

132. Plaintiff does not presently allege that PenFed's Experian pull generated that particular ACDV; Plaintiff alleges only the relevant chronology and will seek the underlying records in discovery.

Wells Fargo Bank

133. In 2026, Wells FArgo Bank declined an auto-financing transaction involving Plaintiff.

134. Wells fargo adverse-action materials identify consumer-report information from Experian.

135. The materials include an Experian score of approximately 587 and identify serious delinquency and additional derogatory credit factors.

136. Plaintiff alleges that these events constitute concrete credit injuries occurring during the period of disputed reporting.

## XVI. EMOTIONAL AND PHYSICAL DISTRESS

137. Plaintiff also suffered substantial emotional and physical distress associated with prolonged credit-report problems and difficulty obtaining housing, favorable interest rates, and affordable transportation.

138. On September 15, 2025, Plaintiff was evaluated by a medical provider.

139. Plaintiff received a PHQ-9 score of 17.

140. Plaintiff also received a Generalized Anxiety Disorder score of 17.

141. The medical record documents stress, moderately severe depression, severe anxiety, sleep disruption, loss of appetite, worry, and intermittent palpitations.

142. The treating provider's encounter note expressly records Plaintiff's reported stress as related to inaccuracies on his credit reports affecting his ability to obtain decent housing, favorable interest rates, and a vehicle at an affordable rate.

143. The record further documents non-restorative sleep, approximately five hours of sleep, loss of appetite due to worry and stress, anxiety, depression, and intermittent chest pain and tightness.

144. Plaintiff does not allege that American Express was the sole cause of every emotional or physical symptom.

145. Plaintiff alleges that American Express's continued furnishing and repeated verification of disputed derogatory information contributed to the prolonged credit-reporting problems that caused him concrete distress and financial difficulty.

## XVII. APPLICABLE FURNISHER DUTIES UNDER THE FCRA

146. Under 15 U.S.C. § 1681s-2(b), once a consumer reporting agency notifies a furnisher that a consumer disputes furnished information, the furnisher must investigate the disputed information, review the relevant information provided by the CRA, report the results, and make the corrections required when information is inaccurate, incomplete, or cannot be verified.

147. In Johnson v. MBNA America Bank, N.A., 357 F.3d 426, 430–31 (4th Cir. 2004), the Fourth Circuit held that § 1681s-2(b) requires a furnisher, after CRA notice, to conduct a reasonable investigation of its records to determine whether the disputed information can be verified.

148. The Fourth Circuit rejected the contention that a furnisher satisfies the statute through a merely superficial review, reasoning that an investigation necessarily involves a meaningful degree of inquiry.

149. In Saunders v. Branch Banking & Trust Co. of Virginia, 526 F.3d 142, 148–50 (4th Cir. 2008), the Fourth Circuit further recognized that furnished information may be actionable when it creates a materially misleading impression even where individual components may be technically accurate.

150. More recently, the Fourth Circuit has emphasized that a furnisher claim may proceed where the challenged inaccuracy or incompleteness is objectively and readily verifiable and the furnisher failed to conduct the investigation required after CRA notice. *See Roberts v. Carter-Young, Inc.*, 131 F.4th 241 (4th Cir. 2025).

151. The information disputed here is objectively verifiable from ordinary account records: payment dates, billing statements, monthly account statuses, DOFD, closing date, charge-off date, and the historical data American Express furnished.

152. Additionally, in Cosmas v. American Express Centurion Bank, Civil No. 07-6099 (FLW) (D.N.J. June 11, 2010), a federal district court applying § 1681s-2(b) to American Express recognized that the reasonableness of the furnisher's investigation may present a factual issue and declined to resolve the FCRA furnisher claim in American Express's favor at summary judgment where questions remained concerning the investigation.

153. Plaintiff does not cite *Cosmas* as proof that American Express violated the FCRA in this action or in every prior case.

154. Plaintiff cites it only as persuasive authority concerning the statutory investigation duty imposed on a furnisher after CRA notice.

XVIII. COUNT I

FAIR CREDIT REPORTING ACT

15 U.S.C. § 1681s-2(b)

UNREASONABLE FURNISHER INVESTIGATIONS

155. Plaintiff incorporates Paragraphs 1 through 154 as though fully restated herein.

156. American Express furnished information concerning Plaintiff to one or more consumer reporting agencies.

157. Plaintiff disputed the accuracy and/or completeness of the American Express information with consumer reporting agencies.

158. Those CRAs subsequently notified American Express of Plaintiff's disputes pursuant to the FCRA.

159. American Express's own written correspondence confirms that it received CRA-generated ACDVs concerning Plaintiff's account.

160. American Express was therefore obligated under 15 U.S.C. § 1681s-2(b) to conduct reasonable investigations concerning the disputed information.

161. American Express was required to review relevant information supplied through the CRA dispute process.

162. American Express was required to report the results of its investigations.

163. If the investigations established that information was inaccurate, incomplete, or could not be verified, American Express was required to take the corrective action prescribed by § 1681s-2(b).

164. Plaintiff repeatedly disputed objectively verifiable account information.

165. These disputes included the Date of First Delinquency, historical delinquency progression, opening and closing dates, and charge-off-related information.

166. American Express nevertheless repeatedly responded that account information was accurate, verified, updated, or required no change.

167. Materially different historical delinquency sequences existed for the same completed months.

168. American Express's own September 2024 dispute responses did not reflect one stable historical account.

169. Plaintiff specifically disputed the DOFD and related account dates through TransUnion in December 2024.

170. American Express responded that the information was accurate as last submitted and required no change.

171. American Express then received still more CRA disputes and validated its reporting as accurate on October 31 and November 3, 2025. The investigations giving rise to this claim include those American Express completed on or about January 3, 2025, October 31, 2025, and November 3, 2025. Plaintiff's disputes and American Express's responses before December 2024 are alleged as evidence of notice, of the instability of the reported history, and of willfulness.

172. American Express possessed account-level records capable of resolving the disputed chronology.

173. Those records included billing statements, payment records, payment-plan information, account ledgers, delinquency records, charge-off information, and prior data furnished to the nationwide CRAs.

174. American Express's own January 19, 2026 correspondence identified a specific account chronology but simultaneously stated that American Express was unable to validate the debt or provide documents validating the account.

175. Plaintiff alleges that American Express failed to conduct investigations reasonably capable of reconciling these discrepancies.

176. Plaintiff further alleges that American Express failed to adequately determine which historical information was accurate before continuing to verify and furnish the disputed tradeline.

177. Under *Johnson*, a furnisher may not satisfy § 1681s-2(b) through a superficial inquiry that is not reasonably capable of determining whether the disputed information can be verified.

178. American Express's conduct violated 15 U.S.C. § 1681s-2(b).

## XIX. NEGLIGENCE AND WILLFULNESS

179. American Express's violations were at minimum negligent within the meaning of 15 U.S.C. § 1681o.

180. Plaintiff suffered actual damages as a result of the prolonged inaccurate, incomplete, inconsistent, and/or inadequately investigated credit reporting.

181. Alternatively, Plaintiff alleges that American Express's conduct was willful and/or in reckless disregard of its statutory duties within the meaning of 15 U.S.C. § 1681n.

182. American Express received repeated CRA notices concerning the same account over an extended period.

183. American Express had notice of materially inconsistent historical reporting.

184. At least one dispute expressly required verification of the DOFD and additional account dates.

185. American Express had access to records capable of resolving those issues.

186. American Express nevertheless repeatedly returned verification responses.

187. By October and November 2025, American Express had already been notified repeatedly that Plaintiff challenged the account's historical reporting.

188. American Express subsequently acknowledged both that it had validated those CRA disputes as accurate and that it was unable to validate the debt or provide validating documents.

189. Discovery will reveal the actual investigation procedures American Express employed, the records reviewed, the identity and training of any investigators, the role of automated systems, and the time and effort devoted to Plaintiff's disputes.

190. Upon information and belief, American Express verified the disputed information without reviewing readily available source records, including its billing statements and delinquency records. This is supported by its later statement that it was unable to validate the debt or provide documents validating the account, despite having repeatedly verified the reporting as accurate.

XX. DAMAGES

191. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages including:

a. denial of credit opportunities;

b. impairment of access to mortgage and automobile financing;

c. reduced creditworthiness in the eyes of actual lenders;

d. reputational injury in the credit marketplace;

e. emotional distress;

f. anxiety and depression;

g. sleep disturbance and appetite disruption;

h. physical manifestations of stress;

i. time and inconvenience spent repeatedly disputing the same information;

j. postage, copying, credit-monitoring, and dispute-related expenses;

k. loss of favorable borrowing opportunities;

l. other actual economic and noneconomic damages to be proven through discovery and at trial.

192. Plaintiff will supplement his damages calculation as additional underwriting records, CRA records, American Express furnishing records, and other evidence are obtained through discovery.

## XXI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant American Express National Bank and award:

A. Actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o;

B. Statutory damages to the extent permitted for willful violations pursuant to 15 U.S.C. § 1681n;

C. Punitive damages to the extent authorized by 15 U.S.C. § 1681n;

D. Costs of this action;

E. Reasonable attorneys' fees to the extent Plaintiff incurs recoverable attorneys' fees;

F. Prejudgment and post-judgment interest as permitted by law; and

G. Such other and further relief as the Court deems just and proper.

XXII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted this 30 day of September, 2026.

Jahlil I. Kure

Plaintiff, Pro Se

7120 South Line Drive, Apt 501

Charlotte, North Carolina 28217

(862) 408-0384

kure.jahlil4@gmail.com